IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NORTHWESTERN MUTUAL LIFE )
INSURANCE COMPANY, )
 )
    Original Plaintiff, )
 )
    v. ) No. 13 C 5957
 )
ELEONORE M. CULL, et al., etc., )
 )
    Original Defendants/ )
    Counterplaintiffs. )

## MEMORANDUM OPINION AND ORDER

Northwestern Mutual Life Insurance Company ("Northwestern Mutual") initiated this interpleader action against (1) Eleonore Cull ("Eleonore"), the first wife of decedent John Cull ("John"), and (2) Linda Cull ("Linda"), John's wife at the time of his death, seeking a determination as to which of them was entitled to $125,000 in proceeds from insurance policies on John's life.[1] By leave of this Court, Northwestern Mutual deposited the contested $125,000 in an escrow account and was dismissed from the suit, leaving Linda and Eleonore alone to dispute ownership of the funds. For the reasons discussed below, Eleonore ultimately carries the day.

According to both parties, the basic facts are these. Eleonore and John divorced in 1980 pursuant to a Judgment of Dissolution of Marriage entered on February 20 of that year.

---

[1] Federal jurisdiction is based on diversity of citizenship.

Incorporated into that judgment was a separation agreement ("Agreement"), whose terms this Court is now called upon to interpret.

In accordance with the Agreement's terms, throughout John's lifetime and up to the time of his death John maintained two life insurance policies with Northwestern Mutual. Agreement ¶8, the principal (though not the sole) key to resolution of the parties' dispute, is reproduced as Ex. 1 to this opinion.

From 1980 until 1999 John complied with Agreement ¶8 by retaining Eleonore as a named beneficiary of those policies. Then, however, he designated himself and Linda as Trustees of the John J. Cull Living Trust as the primary beneficiary. As the result of John's death, Linda is now the sole Trustee and, in that capacity, the primary beneficiary. Eleonore reads the Agreement as requiring John to have maintained her as beneficiary of at least $125,000 in life insurance proceeds, so that she is entitled to the entire proceeds in escrow. Linda disagrees, arguing that John's obligation to carry insurance in Eleonore's favor ended in 1993.

Linda (in her capacity as trustee) and Eleonore have filed cross-motions for judgment on the pleadings in accordance with Fed. R. Civ. P. ("Rule") 12(c).[2] Linda and Eleonore agree on all

---

[2] Judgment on the pleadings is appropriate when, based on the admitted facts, "no material factual issue remains to be resolved and [a movant] is entitled to judgment as a matter of

2

relevant facts, so that the case turns on the application of principles of contract interpretation familiar to any first-year law student.

## Entitlement to the Policy Proceeds

Agreement ¶22 provides that its terms shall be construed in accordance with Illinois law. And Illinois law calls for this Court to interpret divorce-related property settlement agreements (such as the Agreement) just as it would any other contract (Cohn v. Metro. Life Ins. Co., 202 Ill.App.3d 86, 89, 559 N.E.2d 790, 792 (1st Dist. 1990)).

Contract construction under Illinois law involves the two-step inquiry set out in Lumpkin v. Envirodyne Indus., Inc., 933 F.2d 449, 456 (7th Cir. 1991). Here, with citations and internal quotation marks and brackets omitted, is Lumpkin's teaching:

> First, it is necessary to look to the plain language of the provision at issue. Reviewing Illinois law, this Court has noted that the starting point must be the contract itself. If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over. If the plain language of the contract is ambiguous, then the court must go on to declare the contract's meaning. If the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide. However, if the parties dispute the extrinsic evidence on an ambiguous contract, then a fact-finder

---

law" (Nat'l Fid. Life Ins. Co. v. Karaganis, 811 F.2d 357, 358 (7th Cir. 1987)). Linda and Eleonore agree upon all material facts here--differing only on the proper reading of the Agreement--so that the case is fully capable of resolution at this stage.

3

must be called upon to determine the intent of the parties.

In that respect <u>In re Doyle</u>, 144 Ill. 2d 451, 468, 581 N.E.2d 669, 676 (1991) (citations omitted) instructs:

> The objective to be reached "in construing a contract is to give effect to the intention of the parties involved." Provided no ambiguity exists within the contract, the intentions of the parties, at the time the contract was formed, must be ascertained from the language of the contract.

<u>Shelton v. Andres</u>, 106 Ill. 2d 153, 158, 478 N.E.2d 311, 314 (1985)(citations and internal quotation marks omitted) elaborates on the court's search for intention:

> Generally, where there is no ambiguity, courts will look to the deed itself as the only criterion of the intention of the parties. However, it is also true that an instrument should be given a fair and reasonable interpretation based on consideration of all its language and provisions. In attempting to arrive at a fair and reasonable construction, courts are not confined to a strict and literal construction of the language used, when such construction will frustrate the intention of the parties, gathered from a consideration of the whole instrument.

Because the Agreement is hardly a model of contractual drafting, deciphering the contracting parties' intention requires an examination of the language and structure of the entire instrument. To that end a brief overview of the Agreement is called for.

For that purpose it is important to know that the children referred to in Agreement ¶8, four in number, were then

4

respectively 20, 18, 17 and 8 years old (Agreement Recital ¶C).³
Agreement ¶6 required John to pay for four years of college education for each child, an obligation that terminated when each child reached 22 years of age.

Vital as well to the analysis of the Agreement's insurance provisions and their purpose are the obligations that John undertook in Agreement ¶5 for the support and maintenance of Eleonore and the couple's minor children. In addition to specified lump sums based on the children's status as minors when residing with Eleonore, John committed to the <u>monthly</u> payment of $2,000 as Eleonore's maintenance, subject to abatement of $500 when either of the two minor children "reaches age eighteen respectively, is attending college at the expense of the Husband, or is otherwise emancipated, whichever event occurs first." That monthly maintenance payment to Eleonore, however, could never fall below $1,500:

> However, in no event will the aforesaid payments to the Wife by the Husband be less than $l,500.00 per month ("floor") subject to the provisions of Paragraph 11.⁴

Linda and her counsel would have this Court ignore those facts and what they teach as the obvious purpose of the

---

³ John and Eleonore also had one adopted child who, because she was already 27 years old at the date of the Agreement, was not the subject of John's undertakings under the Agreement.

⁴ [Footnote by this Court] That latter provision is not implicated here.

5

Agreement ¶8 insurance requirements. Those requirements, with their designation of Eleonore and the children as <u>irrevocable</u> beneficiaries of those policies, were not merely purposeless and gratuitous as to Eleonore any more than they were as to the children.

No, those insurance provisions clearly served a classic purpose of insurance: to underwrite a contractual undertaking by providing security against the contingency that the death of the promissor (John) could jeopardize the performance of his promises. Put a bit differently, each provision for <u>in</u>surance plainly served the purpose of <u>as</u>surance that John's contractual undertakings would be buttressed by the availability of insurance proceeds if John were to die--proceeds that would provide security to that extent for the performance of the promises even if that contingency were to occur.

Look at the provisions for the children: $16,750 to each to assure him or her the promised college education--why else would each child be made an irrevocable beneficiary, with the $16,750 in coverage to abate "[a]s each child reaches age eighteen or completes a college education, unless earlier emancipated, whichever shall last occur"?[5] Again the insurance provision was

---

[5] Remember that the parties to the Agreement were speaking in 1980, long before the explosion in the cost of secondary education, which has far outstripped any effects attributable to inflation as such, reached today's astronomical level. Although the current generation of lawyers may have difficulty believing

6

integral to an assurance that John's commitment ro provide each child with a college education would be honored even if his death intervened to put that commitment at possible risk.

Just so with the additional guaranteed $125,000 in insurance coverage, with Eleonore designated as its irrevocable beneficiary. At the guaranteed $1,500 per month ($18,000 per year) floor to provide her with permanent maintenance,[6] $125,000 in life insurance coverage would serve as security for seven years of the required maintenance payments. And with the couple having freely negotiated for no abatement in that $125,000 level, as contrasted with the abatement provisions regarding the children's entitlements, neither this Court nor (certainly) Linda as John's second wife has the right to rewrite the parties' bargain simply because Eleonore is now 33 years older than when the divorcing couple made that bargain in 1980.

Any such (or any other) logical explanation of why Article ¶8's insurance provision extends to Eleonore at all is conspicuously absent from Linda's submission. Instead she and her counsel treat it as wholly gratuitous, making nothing of the provision's requirement of irrevocability in designating her as a

---

it, there was a time when $16,750 would provide a college education at a good university.

[6] It is no accident that John confirmed the permanence of that arrangement--he continued to pay Eleonore $1,500 monthly right up to the time of his death.

beneficiary.  Instead they point to two ambiguities in language, obviously hoping to divert attention from the obvious question "why?"

First of those language issues is the sentence that says that John must carry insurance while he has "any obligations under this agreement" to Eleonore "and" the children, which Linda attempts to portray as meaning that John's obligation to carry insurance for Linda's benefit ceased when he fulfilled his obligations to the children.  And the second is a later sentence that says John's obligation "under this provision" shall terminate when each child reaches the age of 22.  But read Linda's way, those sentences would make nonsense of much of Agreement ¶8 and would conflict directly with the already-explained clear purpose of the parties.

As for the first sentence that Linda seeks to invoke, she and her counsel fail to acknowledge that giving the word "and" a literal conjunctive meaning would promote absurdity.  If for example Eleonore had died shortly after finalizing the Agreement, under Linda's reading the consequent cessation of John's obligations to Eleonore would also erase John's obligations to maintain the <u>children</u> as beneficiaries--because, as Linda would have it, he would no longer have obligations to Eleonore "and" the children.  Nonsense--that would frustrate what Linda also recognizes as the carefully crafted successive abatements of

8

$16,750 each.

It is far more sensible to read that sentence as collectivizing the "Wife" (Eleonore) and "the children" as the intended beneficiaries of the life insurance that Agreement ¶8 sets up as performing that double duty. And if the provision has been drafted in an awkward way to convey that purpose, Illinois law permits "and" to be read as the disjunctive "or" to carry out the parties' clear intent.

While the use of "and" between two elements generally indicates that both elements must be satisfied, the Illinois Supreme Court "has also recognized that 'and' is often used interchangeably with 'or,' the meaning being determined by the context" (County of DuPage v. Ill. Labor Relations Bd., 231 Ill.2d 593, 606, 900 N.E.2d 1095, 1102 (2008)). As Chicago Land Clearance Comm'n v. Jones, 13 Ill.App.2d 554, 559, 142 N.E.2d 800, 803 (1st Dist. 1957) has put it, "in order to effectuate the intention of the parties to a contract, where the intention is evident, the word 'and' may be construed to mean 'or'." In short, where (as here) reading "and" in its literal sense would create an inconsistency or render the sense of an instrument dubious, the substitution of "or" for "and" is fully justified (id.).

To turn to Linda's second effort to substitute the claimed inflexibility of rules of construction for common sense, her

9

counsel points to this later sentence in Agreement ¶8:

> The Husband's obligation to maintain life insurance on his life under this provision shall terminate when each child, attending college, attains the age of twenty-two years.

Linda argues that "this provision" refers to the whole of Agreement ¶8, so that John's obligation to maintain life insurance in favor of Eleonore also terminated along with his obligation to maintain insurance for his children. But read in context, the sentence merely provides that John's obligation to maintain the <u>additional</u> $16,750 for each child will terminate as each child reaches 22 years. More sensibly read in light of the earlier-explained overall purpose of the <u>in</u>surance as <u>as</u>surance, "this provision" refers not to the whole of Agreement ¶8, but rather to its parts dealing with John's insurance obligations to his children.

Linda's proposed reading of that sentence would eviscerate many of the protections preserved in Agreement ¶8. That paragraph's mandate that John's insurance coverage could "in no event" drop below $125,000 would lose its entire force, as would the paragraph's prohibition on any borrowing against the policy that would reduce the net death benefit below that figure.

Once again Linda's proposed reading is at war with common sense. Under that reading John's obligation to carry insurance for three of the children (all of whom were at least 17 years of age) would cease within five years. But John would be required

10

to maintain not only the remaining $16,750 for the fourth child but also the $125,000 floor for an additional eight years--only to be entirely freed from that much larger obligation when the youngest child reached 22, thereby leaving no insurance to secure his continuing lifetime obligation to Eleonore.[7]  Once more that construction attributes no logical purpose to the $125,000 coverage:  As Linda would have it, that coverage could not be intended for Eleonore, for she would soon lose any protection, and it could hardly be intended for the one remaining child when the other three children had each been insured for just an additional $16,750.

Moreover, recall that Agreement ¶8 repeatedly specifies that John's insurance coverage could not fall below $125,000.  But so long as John had any child under the age of 22, he was obliged to carry <u>more</u> than $125,000 (at the least, he would have to carry the base $125,000 in addition to $16,750).  Only once all four children had graduated or reached 22 would the $125,000 "floor" even become relevant--hence Agreement ¶8 plainly contemplates that John's insurance obligation would continue past that date.  And for whom?  For Eleonore, of course.

Finally, Linda's proposed reading is at odds with other provisions of the Agreement as well.  John's obligations to pay

---

[7] John clearly recognized that lifetime obligation--he continued to pay Eleonore the $1,500 in monthly maintenance right up to the date of his death.

11

for his children's college education, to pay for their medical and dental care and to pay maintenance and support while they were home from college all terminated as each child reached 22 years of age. By total contrast, none of John's obligations to Eleonore were designated to terminate when the children reached the age of 22. To suggest that John and Eleonore intended that the moment at which their last child reached 22 should serve as a magic date that would end Eleonore's insurance that was there to protect her against the risk of losing her right to support and maintenance defies reason as well.

**Conclusion**

For the reasons discussed here at some length, this Court rejects the effort by Linda and her counsel to read snippets of the Agreement's language in a manner divorced from reality. Hence Linda's motion (Dkt. 23) is denied, while Eleonore's (Dkt. 24) is granted. All the escrowed funds are ordered to be paid over to Eleonore forthwith, and with Northwestern having previously been dismissed from the litigation, that final order terminates this action.

_____
Milton I. Shadur
Senior United States District Judge

Date: November 13, 2013

at the expense of the Wife but will continue until that child ceases to attend said Community College. The Husband's obligation to pay or contribute to the college education shall terminate when each child obtains age twenty-two plus such extension of age by that number of years of illness or military service.

7. The Husband shall pay for the extraordinary medical and dental care of any child who has not yet reached the age of twenty-two and is pursuing a college education at the expense of either party. The Husband's obligation with respect to any child will terminate if that child has completed a high school education, has chosen not to pursue a college education, and is gainfully employed by an establishment where that child is eligible for his or her own medical insurance. The term "extraordinary" as used in this paragraph shall include, but not by way of limitation, all teeth straightening, major dental work, and operations and services rendered as a result of serious accidents or as a result of serious illnesses requiring hospitalization or extended medical care but shall not include routine check-ups, minor ailments, drug supplies (except if required in the treatment of serious illness), dental prophylaxsis and the like.

Notwithstanding the foregoing limitations, the Husband specifically agrees to pay for the extraordinary medical, surgical and orthodonture expenses and any necessary psychiatric care required by the minor child, KEVIN, until KEVIN reaches age twenty-two, whether or not he is attending any college or university.

In the event of the need for extraordinary medical or dental care, the Wife shall consult the Husband before incurring expenses in any of those connections unless it is a case of emergency where a child's life or health might be imperilled by delay.

The Husband, at his sole expense, shall obtain and maintain a policy of major medical insurance covering the major medical needs of the children for whom he has an obligation therefor.

8. The Husband has had issued on his life certain policies of insurance in the total face value of $192,000.00. A list of those policies is attached hereto as Exhibit A. While the Husband has any obligations under this agreement to the Wife and the children of the parties, the Husband shall designate the Wife and the children as irrevocable beneficiaries of those policies. The Husband shall submit

Ex. 1-1

to the Wife, within thirty days of the effective date of this agreement, proof that the Wife and children have been designated as such irrevocable beneficiaries. As each child reaches age eighteen or completes a college education, unless earlier emancipated, whichever shall last occur, the amount of insurance to be maintained may be reduced in the amount of $16,750.00. However, in no event will the amount of insurance to be maintained be less than $125,000.00.

The Husband agrees to pay the premiums when they become due and to direct that duplicate premium notices and proof of payment of premiums (cancelled checks) be sent to the Wife. The Husband retains the right to borrow monies using those insurance policies as collateral but in no event may any such loans reduce the net death benefit below $125,000.00. The Husband's obligation to maintain life insurance on his life under this provision shall terminate when each child, attending college, attains the age of twenty-two years. In the event the child is attending college at the Husband's expense and the Husband's obligation is extended pursuant to the last sentence of paragraph six, the Husband shall maintain the life insurance as to that child until the end of the extended period of years.

The Wife shall retain as her sole and separate property, the Northwestern Mutual Life Insurance Policy #6309761, insuring her life. The Wife has in her possession and shall simultaneously with entry of Judgment of Dissolution of Marriage herein, return to the Husband the following life insurance policies:

    (a) Northwestern Mutual Life Insurance Company policy #6489142.

    (b) Northwestern Mutual Life Insurance Company policy #6466465.

    (c) Northwestern Mutual Life Insurance Company policy #6466466.

    (d) Northwestern Mutual Life Insurance Company policy #6466467.

    (e) Northwestern Mutual Life Insurance Company policy #6466468.

9. ~~Upon the effective date of this agreement, the Husband shall quit claim to the Wife all of his right, title and interest in the~~

Ex. 1-2